**GILL et al. v. UNITED STATES et al.**

United States District Court
S. D. New York.
July 19, 1949.

Jacquin Frank, New York City, for libelant.

John F. X. McGohey, United States Attorney, New York City (Kirlin Campbell Hickox & Keating, New York City, By Raymond Parmer, Joseph M. Cunningham, New York City, of counsel), for respondent United States of America.

Galli & Locker, New York City (Patrick J. McCann, New York City, of counsel), for respondent-impleaded.

GODDARD, District Judge.

This action is brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., on behalf of the estate of Martin Gill, a stevedore who was killed by being precipitated into the ship's hold while working aboard the Steamship Cornelia on November 12, 1945.

The libel filed May 9, 1946 alleges that the libelant, the deceased stevedore's wife, was duly appointed administratrix of his estate by the Surrogate of Hudson County, New Jersey; that the United States Government and the War Shipping Administration owned and operated the Cornelia; that the War Shipping Administration is an agency of the United States; "that at all times hereinafter mentioned the said S. S. Cornelia was moored at Pier 9, Jersey City, New Jersey". The libel then alleges the unseaworthiness of the Cornelia, and negligence of respondents, the dependents of the deceased, and the admiralty jurisdiction of this court.

Respondent's answer is a general denial of the material allegations of the libel and sets forth four separate and complete defenses, including the following: "Eighteenth: Respondent objects to the exercise by this court of jurisdiction in this action on the ground that the action has not been brought in the proper district."

Subsequent to the filing of its answer, respondent on September 11, 1947 petitioned this court under Admiralty Rule 56, 28 U.S.C.A., for leave to bring in the deceased stevedore's employer as a party jointly or liable over to the respondent. This petition was granted. Respondent served interrogatories which were answered. On April 8, 1949 the case proceeded to trial.

Counsel made their opening statements. No motion was made to dismiss or transfer the case because of improper venue. After the testimony of one witness had been completed, the court adjourned to the following day; then, for the first time, counsel for respondents, United States and War Shipping Administration, moved to dismiss or transfer the case to New Jersey on the ground of improper venue. Decision was reserved.

■ Before considering liability, the question whether the venue requirements of Section 2 of the Suits in Admiralty Act, 46 U.S.C.A. § 742, have been met, must be determined.

The action is one which could have been brought either in rem or in personam, but as it is brought under Section 2 of the Suits in Admiralty Act, it is an action in personam. Hoiness v. United States, 335 U.S. 297, 69 S.Ct. 70.

Under that section the venue may properly be laid in any one of three places:

1. Where the parties so suing reside.

2. Where the parties have their principal place of business in the United States.

3. In which the vessel or cargo charged with liability is found.

Metaxas v. United States, D.C., 68 F. Supp. 667.

The libelant was and is a resident of New Jersey; hence could not, on the ground of residence, lay the venue in this district, and it is apparent that neither libelant nor respondent have their principal place of business in this district.

■ In its answer to the libel respondent excepted to the libel on the ground of improper venue, which the respondent may do without waiving its right to move for dismissal or transfer on the ground that the venue is improperly laid. Untersinger v. United States, 2 Cir., 172 F.2d 298; Orr v. United States, 2 Cir., 174 F. 2d 577.

■ Although the answer contains a defense of improper venue, still it could waive venue. Hoiness v. United States,

supra, 28 U.S.C.A. § 1406(b); Sawyer v. United States, D.C., 66 F.Supp. 271, 277; Grant v. United States, D.C., 65 F.Supp. 507; see Carroll v. United States et al., 2 Cir., 133 F.2d 690.

■ At the time the libel was filed the Cornelia was not in this district but it was stipulated at the trial that the Cornelia had been within this district on three occasions between the time the libel was filed and the trial. Had the respondent moved to transfer at the time the libel was filed, the motion would have had to be granted. But respondent did not elect to do so. It waited and in the meanwhile the Cornelia came into this district, and at the time respondent moved to transfer, proper venue had been established. See Sawyer v. United States, supra; Grant v. United States, supra; Carroll v. United States, supra.

■ Moreover, while the Untersinger and the Orr cases hold that a respondent may in its answer plead to merits and except on the ground of improper venue without prejudicing its rights, I think that the option to move to transfer or proceed to trial must be exercised in a timely manner and that a respondent may not proceed to trial on the merits and defer its motion to transfer after hearing testimony on the merits. It seems to me that if the respondent proceeds to trial without making a motion to transfer for lack of proper venue, it may be deemed to have waived the question of venue and prefers to go to trial on the merits. Silk v. United States, D.C., 79 F.Supp. 579.

Respondent's motion to dismiss or transfer the suit on the ground of improper venue is denied.

Gill, the deceased, was foreman of a gang of stevedores in the employ of the respondent-impleaded, Turner & Blanchard, Inc., working the No. 3 hold of the Cornelia and was killed on November 12, 1945 at about 8:30 a. m. when the catwalk upon which he was standing was about to be lifted from the ship to the pier by derricks with falls operated by winches. The fall suddenly started upward, caught on the catwalk and the catwalk with Gill and Christensen, another stevedore, were precipitated through the open hatch to the bottom of the ship. Christensen was also a party plaintiff, but his action has been severed.

The catwalk was on the starboard side of the ship, which was moored bow in and extended about 8 feet above the deck from the midship housing to the boat deck on the other end. The catwalk was some 15 feet long with hand rails on each side and weighed about 1500 pounds. No. 3 hatch located between the deck housing and the boat deck is 10 feet 5 inches fore and aft, 16 feet wide, and is surrounded by a coaming 3 feet high and the starboard side of the hatch is directly beneath the catwalk. On the port and on the starboard side of the midship housing were Lidgerwood twin-engine single acting friction winches.

When the gang of stevedores which was to load cargo into No. 3 hold arrived on board ship the head stevedore Hekker found it necessary to remove the catwalk to the pier as it interfered with the handling of cargo, but as they did not have the necessary tools for removing the bolts which held the catwalk in place, he sent for the tools and in the meanwhile he ordered the tarpaulin, plugs and strong back of the No. 3 hatch to be removed. This was done with the up and down port winch operated by Brown, a stevedore. After this was done and the bolts had been removed, Gill and Christensen placed a sling around the catwalk and waited on it, ready to insert the hook of the fall into the sling. The up and down fall was married to the pier fall so together the catwalk could be lifted over to the pier. Brown was at the controls of the up and down winch. Minado, another stevedore, the signal man was standing on the deck inshore of the inshore edge of the catwalk above him. In operating the winch it was necessary for Brown to stand with his back to the men on the catwalk and to look over his shoulder to see the signal man. Baldwin was preparing the starboard winch for operation. Brown received an oral signal from Minado to go ahead slowly. Minado took hold of the hook which had two shackles above the hook and guided its ascent until it got above his reach and then signalled Brown to stop the winch which Brown did. Up

to this point the testimony is in substantial accord, but there is a sharp conflict in the testimony as to what occurred thereafter.

Brown testified that after getting the first order from Minado to stop, he stopped it and then asked Minado to go forward to the after end of the hatch so that he could see him better; Minado did so and then gave Brown a hand signal to go ahead a little, which he did; this signal was soon followed by a signal from Minado to stop; that he, Brown, shut off the steam, raised the friction lever and applied the foot brake; that he noticed that the drum of the winch continued to turn and the hook and shackle kept going up; that as he glanced up he saw the catwalk with Gill and Christensen falling into the hatch.

Brown and Minado testified that the winch had stuck when it was being used to remove one of the strong backs from the hatch and then suddenly the strongback fell heavily to the deck. Brown said that he had raised the friction lever to its utmost and that would normally release the friction drum and permit the drum to revolve, but nothing happened until the strongback suddenly crashed down. This seems to support the conclusion that the friction lever had a tendency to stick with the result that the clutch failed to disengage.

Minado testified that he guided the hook until it got beyond his reach; that when the winch stopped Christensen took hold of the hook to keep it away from the railing on the catwalk and it was led over the rail to the floor of the catwalk; that he did not see what happened after this as he had finished his part of the work and walked away. But says that after giving Brown the signal to stop he gave no signal to go ahead; that Minado walked away and did not see what was taking place seems unlikely; obviously he had not finished what was required from him for the catwalk was about to be moved over to the pier by the winches and he was stationed in his position for the purpose of watching when the hook was inserted in the eye of the sling and signalling to the winchmen when it was ready for them to go ahead. My impression is that his testimony was influenced by the fact that he wanted to avoid antagonizing Hekker, the head stevedore who has charge of the hiring of the men who compose the "gang" to work a vessel.

Hekker, the head stevedore, said that he was standing on the inshore side of the hatch behind Minado; that he arrived there as Minado was guiding the hook up to Gill and Christensen; that when Minado gave the order to stop, the winch stopped and Christensen took the hook, passed it over the rail, and while Gill and Christensen were attempting to put the hook into the eye of the sling the winch went ahead without any signal from Minado and the shackle on the moving tackle caught on the off shore side of the catwalk and the catwalk with Gill and Christensen fell through the hatch. Hekker's testimony was not convincing. He told the widow of the deceased the night of the wake of the deceased, when she asked him how it happened—"Mrs. Gill, I am sorry, I was not there at the time of the accident. The first I knew about it is when I heard the crash". Although he denied making any such statement, I have no doubt that he did, for Mrs. Gill impressed me as a very truthful person. Moreover, when the police came to the scene to interview witnesses in the course of their investigation, neither Hekker himself nor any one suggested that Hekker was present when the accident happened. Those who were present do not deny that he may have been there, but do say that they did not see him. After hearing Brown, Hekker and Minado, and observing them during the trial, my conclusion is that Brown's description of what took place is substantially true.

Driscoll, a longshoreman who had been working at No. 2 hatch, testified that five or ten minutes after the accident he attempted to operate the port winch to bring an "airplane platform" from the pier to the hatch upon which the bodies of Gill and Christensen were to be removed from the hold. When he tried to get some slack on the cable to connect it with the "airplane" the winch stuck and he could get no slack until some one standing by "tapped" or struck the winch and "it loosened up".

Respondent urges that even if the port winch was defective, it would not cause the fall to be raised.

Both the libelant's and the respondent's experts testified that after the steam was shut off the residual steam remaining in the chambers of the winch would cause some movement of the drum if the clutch was engaged. But the experts differ as to the degree or distance of movement.

It also appeared that if the friction lever is operating properly when raised it throws out the clutch and so eliminates the raising power. The winch lowers by gravity and the foot brake is applied to check the downward movement. However, if the friction lever sticks so that the clutch stays in, the foot brake is used to check the driving power. It is therefor apparent that after the steam is shut off the residual steam remains and when the friction lever fails to release the clutch, this residual steam expands, creating driving power and when the foot brake fails, there is nothing to retard the upward movement of the fall.

Although respondent's expert mathematically calculated the distance the driving force of the residual steam to be only five inches, he did not indicate whether the result would be a gradual or a sudden ascent. Minado described the movement of the catwalk as "like a shot", so it is quite possible that with the clutch in and the foot brake failing to work, this residual steam caused a sudden upward surge or movement of the fall with the result that it caught on the rail of the catwalk and tipped it over. The evidence seems to support this conclusion.

McReynolds, a longshoreman who was operating the winch on Thursday—the accident happened on Monday—testified that the brake was not working and that when he turned off the steam the drum "would take at least a full revolution if the hook was light".

■ That the winch was defective and unsafe and was the cause of the accident, I think has been established. Some of its parts may have been worn out or broken, but whatever the precise trouble was, it was not a proper seaworthy winch.

There was a breach of warranty of seaworthiness and the ship owner is liable for indemnity. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. The deceased was free from negligence contributing to the accident.

■ Respondent argues that if it is held liable, the decree should provide for half damages against the respondent impleaded, Turner & Blanchard, Inc., on the ground that it was negligent in removing the hatch covers before the catwalk was taken down.

It is unnecessary to consider the objection by Turner & Blanchard, Inc., that it had provided compensation for its employees under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., and that therefore the respondent is not entitled to contribution, as I find that the sole proximate cause of the accident was respondent's failure to furnish a safe and proper winch.

■ The deceased was 49 years old with a life expectancy of 21.63 years; he earned about $4,000 a year, of which he contributed $2,737.50 for the support of his wife, who was 49 years old, and six children, aged 22, 19, 17, 14, 12 and 10. According to the American Experience Table, the value of an annuity of $1 using an interest rate of 3 per cent, which is a fair rate, based upon two lives having an expectancy of 21.63 years, is $11.3991. Assuming an annual loss of $2,737.50 capitalized at 3 per cent for 21.63 years, the present value of the future earnings would be approximately $31,205.03. However, it is unlikely that the deceased could continue the heavy work of a stevedore after he was sixty-five. After that his earning power would probably diminish.

In my opinion a fair award to the libelant is $27,000.

A decree may be entered for libelant against the respondents, United States and War Shipping Administration, for $27,000 and dismissing the libel against Turner & Blanchard, Inc.

Libelant to submit proposed findings of fact and conclusions of law within five days and upon two days' notice to respondents and respondent impleaded.